# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| STATE LINE BAG CO., LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:17-CV-00737-DGK |
| | ) | |
| COMPANIONLABS SYSTEMS, INC., | ) | |
| d/b/a HUMAN UNLIMITED, | ) | |
| f/k/a HUMAN UNLIMITED, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This case is a dispute over plastic bags costing $1.32 each. Defendant CompanionLabs Systems, Inc., ("CompanionLabs") sells t-shirts to the public and previously packaged its shirts in bags obtained from Plaintiff State Line Bag Co., LLC ("State Line Bag"). After State Line Bag procured 100,000 bags for CompanionLabs's Human Unlimited brand, CompanionLabs ceased its business relationship with State Line Bag, leaving State Line Bag with inventory it cannot resell to any of its other customers.

Now before the Court is Plaintiff's motion for summary judgment (Doc. 26) and Defendant's motion for summary judgment (Doc. 34). For the following reasons, Plaintiff's motion is GRANTED IN PART and Defendant's motion is DENIED.

## Undisputed Material Facts[1]

The Court finds the facts to be as follows: Brian Deagan ("Deagan") is the co-founder and CEO of CompanionLabs.[2] CompanionLabs has two lines of businesses, one of which is an apparel e-Commerce operation, doing business as Human Unlimited, delivering custom designed t-shirts to consumers. At the time it began working with State Line Bag, it packaged its shirts in a plastic bag imprinted with the Human Unlimited logo, a trademarked logo.

State Line Bag sells drawstring bags in bulk and offers customization via screen-printing. During the events that led to this lawsuit, Jon Yoder ("Yoder") ran the company and was the company's only employee. Generally, State Line Bag maintains an inventory of over one million plain bags, allowing it to ship large quantities to its customers on a same day basis.

State Line Bag sources its bags from AQ Textiles, a manufacturer in Pakistan. The bags are shipped from Pakistan to the United States, for storage in State Line Bag's warehouse. For orders that require screen-printing, State Line Bag ships bags from its warehouse to its screen printer. At the time this dispute arose, State Line Bag worked with Seen Merch, a printing company in Kansas City, Missouri, for screen-printing. State Line Bag's agreement with Seen Merch provides for a turn-around time of no more than two weeks. From Seen Merch, the bags are shipped to the customer. Approximately 30% of State Line Bag's orders involve printing.

CompanionLabs began working with State Line Bag in August 2015. Most all of their interactions were done via email between Deagan and Yoder. CompanionLabs's orders required the Human Unlimited logo printed on the bag. Up until approximately December 2016, the process

---

[1] The Court excluded asserted facts that were immaterial to the resolution of the pending motion, asserted facts that were not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact.

[2] At the time State Line Bag and CompanionLabs were conducting business with each other, CompanionLabs was operating under the name Human Unlimited.

was that Deagan would place an order with Yoder for a number of bags. Yoder pulled plain bags from his inventory and shipped them to Seen Merch for printing. After the printing was complete, Seen Merch shipped the completed bags to CompanionLabs. Including time for printing and shipping, the time between ordering and delivery could take several weeks.

In its first order with State Line Bag, CompanionLabs initially sought to order 1,000 bags. Deagan and Yoder discussed quantity discounts for larger orders. Yoder testified that price discounts were derived from the quantity discounts he got from Seen Merch. For larger print jobs, Seen Merch provided a discount and State Line Bag would pass that discount along to its customer. Ultimately, CompanionLabs placed an order for 2,000 bags at $1.50 per bag.

In early September 2015, after nearly depleting its inventory, CompanionLabs placed an overnight order for 2,000 blank bags at $0.62 per bag. Later in September, CompanionLabs sought to order 2,000 printed bags. After inquiring again about a quantity discount, CompanionLabs ordered 5,000 bags at $1.39 per bag. On November 4, 2015, CompanionLabs ordered another 3,000 bags.

On November 10, 2015, Deagan expressed concerns to Yoder about the price of the printed bags versus the plain bags. Deagan sent an email to Yoder stating in part: "we're going to be buying a ton of bags in 2016. [R]ight now [I] don't have time to shop this, but [I] think in the spirit of partnership, being more aggressive on pricing would be a step in the right direction. [P]lease let me know what you can do for another 5,000." (Doc. 35-3 at 30). Yoder responded that typically the price for 5,000 was $1.38, but that he would reduce the price to $1.30. Deagan responded to Yoder's quote of $1.30:

> [W]e'll easily be ordering 100k in 2016. I think it's important that you're viewing this order in that context. If [I] would shop this next year, people that respond would have the benefit of that context. So [I] imagine they would be more aggressive. [Y]ou should price this

3

> at a level that you think will be competitive with how someone might price it in 2016 to get the business. [S]o [I] won't tell you if 1.30 is high or low, but if prices come in significantly lower than that for the same quantity in 2016, clearly we'd be paying too much.
>
> [I]'ve been very happy with the quality and service. [B]ut [I] do feel like we're paying a premium for the printing.
>
> [H]onestly if I were you, [I]'d make next to nothing on this order as a good faith gesture towards our partnership in 2016.

*Id.* Yoder rejected Deagan's offer to "make next to nothing" on the current order. However, Yoder suggested that if CompanionLabs would sign a letter of intent for 50,000 or 100,000 bags, then Yoder would print the desired quantity and hold them in his warehouse for delivery. Yoder estimated the cost under this arrangement to be $1.15 per bag. Deagan replied that he did not want to make a 50,000-bag commitment at this time. Again, he asked Yoder to reduce the price of the pages to either $1.20 or $1.25. Yoder stated for the current 5,000 order the price would be $1.30 per bag. Ultimately, this price was modified to include two cents per bag for shipping for a total cost of $1.32 per bag.[3] Deagan placed an order for 5,000 bags.

CompanionLabs placed an order in January 2016 for 10,000 bags at a cost of $1.29 per bag, to be shipped and billed in two 5,000-bag increments. In February 2016, CompanionLabs placed a similar order requesting 5,000 bags shipped as soon as possible, and the other 5,000 bags shipped three weeks later, billed in two increments, but at the reduced 10,000-bag order price. Again in April, CompanionLabs ordered 10,000 bags to be shipped and billed in two 5,000-bag increments at the lower 10,000 bag price.

In June 2016, CompanionLabs suggested a thirty-day time-period to pay for future orders ("net 30"). State Line Bag agreed to the net 30 term but also proposed that if CompanionLabs

---

[3] The actual price was $1.322, but for simplicity's sake, the Court will shorten it to $1.32.

would commit to 100,000 bags over thirty-months, State Line Bag would agree to hold prices consistent for two years. CompanionLabs rejected the offer to commit to 100,000 bags. In July 2016, CompanionLabs ordered 5,000 bags.

In August 2016, Yoder emailed Seen Merch asking for a copy of the Human Unlimited logo under the guise that CompanionLabs was changing the logo and Yoder wanted to know how it would look on the bags. Yoder was really using the copy of the logo to change print suppliers from Seen Merch to AQ Textiles. Yoder testified that there was a significant cost difference between printing with Seen Merch and AQ Textiles.

In the same timeframe, Yoder requested a copy of the Human Unlimited logo from Deagan. Yoder explained: "I'm going to print some of your bags to keep in my warehouse so that I'll be able to get them shipped to you right when you order." *Id.* at 51. Deagan replied "awesome," sent the logo, and asked if State Line Bag was using a new supplier for printing, which Yoder denied. Later that month, State Line Bag placed an order with AQ Textiles for 40,000 Human Unlimited bags.

In September 2016, CompanionLabs ordered 5,000 bags. Yoder confirmed the order and then stated: "Just FYI, starting in November I should have a bunch of your bags already made up for you so you can order them as needed and I'll be able to ship same day." *Id.* at 58. Deagan replied: "beautiful. [T]hat's great. [A]ppreciated." *Id.* In October, CompanionLabs placed another order for 5,000 bags. In November, CompanionLabs ordered 10,000 bags, shipped and billed in two 5,000-bag shipments.

Towards the end of December, CompanionLabs placed another order for 10,000 bags, shipped and billed in two increments. Because State Line Bag was now stocking Human Unlimited bags in its warehouse, it could ship the custom bags next day, rather than the several week

5

turnaround time when State Line had to send the bags for printing. Yoder replied: "The [4]0,000[4] bags I had printed up for you are done and should be in the warehouse, I just need to double check. If they are[,] I can get them shipped out to you tomorrow. Just let me know if you want the 5000 or 10,000." *Id.* at 63. Deagan replied: "well done sir. ;) awesome." *Id.* Yoder responded: "Please let me know when you'd like the next 5000 sent, I can ship same day now." *Id.* Deagan replied: "again, really appreciate the pro-activeness on this. [M]eans a ton. [T]hanks." *Id.*

In mid-January 2017, the bags State Line Bag had printed by AQ Textiles arrived at CompanionLabs with an indication that they originated from Pakistan. Deagan asked Yoder if the bags had always been made in Pakistan and Yoder confirmed they always had. Later in January, CompanionLabs placed an order for 10,000 bags.

On February 14, 2017, Deagan sent an email to Yoder stating: "Could you please get 10,000 more bags shipped out to us. If you haven't, I would suggest restocking your supply. This order volume will likely stay consistent and will rise over the year." *Id.* at 75. Yoder replied: "That's great to hear, I will probably get 100,000 printed up so we will be good for a while. Thanks for the heads up. That's no problem, I can get those 10,000 shipped out tomorrow." *Id.* Deagan responded: "perfect. [I]f we can get those 2 day shipping through UPS that would be great." *Id.* Deagan testified that his response "perfect" was directed towards Yoder's statement regarding the order being shipped the next day. Yoder testified that he believed "perfect" referred to his proposal to source 100,000 printed bags to hold in inventory.

In March, State Line Bag placed its second order for Human Unlimited bags from AQ Textiles. Yoder had 20,000 bags shipped by air and 80,000 bags shipped by boat. Later, Yoder placed a third order from AQ Textiles for 20,000 Human Unlimited bags shipped by air.

---

[4] The email lists 50,000, but Yoder testified that was a typo and it should have read 40,000.

6

On March 8, 2017, Deagan again emailed Yoder to place an order for more bags: "Could we get an order going for 10K more bags[?] Do you think you can get them here early next week?" *Id.* at 77. Yoder replied: "I can get those shipped out today. I have 9500 bags left here that I will ship. I have 100,000 being made right now with 20,000 that should be ready any day now, so let me know if you'd like to just make this order for 9500 bags or I can ship the remaining 500 when they're ready." *Id.* Deagan replied: "perfect. We should be good within that time frame and thanks for being proactive. [Y]ou can just hold the 500 until next shipment." *Id.* Yoder responded:

> Ok, will do. . . . Like I mentioned earlier I have 100,000 of your bags being made right now with 20,000 of those that should be here any day now. The other 80,000 should be here within 8-10 weeks so I'm hoping that there won't be a period of time when we are out of your bags but you have been ordering at a higher volume than anticipated (which is great!) so I'm trying to play catch up a bit. I just wanted you to know where I'm at with everything so there are no surprises . . . When the other 80,000 get here we should be good for a while and I'll have another 100,000 started by then.

*Id.* Deagan replied: "appreciate that. [C]an you confirm that we'll have 9,500[?] [Y]ou'll have 20k readily available and the balance of 80k will be there in 8-10 weeks?" *Id.* Yoder responded: "Yes, 9500 were shipped to you today. I have 20,000 that should be here this week or next week at the latest. I'm actually going to have another 20,000 here in 3 weeks or so just in case, then 80,000 more will be here by mid April. *Id.* Deagan testified he wanted Yoder to hold an inventory of bags because then Deagan's future orders could be shipped next day. He further testified that at that time he believed CompanionLabs would use all 100,000 bags because the business was doing so well.

Later in March CompanionLabs placed another order for 10,000 bags, shipped and billed for in two 5,000-bag increments at the 10,000-bag price. Finally, on May 1, 2017, CompanionLabs placed what would be its final order for 5,000 bags.

7

On May 10, 2017, Deagan emailed Yoder and told him that CompanionLabs was considering discontinuing its use of plastic bags to package its t-shirts. He inquired about price discounts and the two worked out a time to discuss in a phone call.

On May 17, 2017, Yoder offered Deagan a 25% discount on future orders. He further stated that State Line Bag had 106,000 Human Unlimited bags remaining in inventory. Deagan replied expressing his appreciation for Yoder's proactiveness, but that he did not believe CompanionLabs was under any obligation to purchase the remaining inventory.

Feeling like it had been left "holding the bag," State Line Bag filed suit against CompanionLabs in the Circuit Court of Jackson County, Missouri alleging CompanionLabs breached its contract to purchase the 100,000 custom bags and alternatively, promissory estoppel claiming State Line Bag detrimentally relied on CompanionLabs's promise to purchase State Line Bag's inventory of Human Unlimited bags. State Line Bag seeks $132,200 in damages, the 100,000 bags multiplied by $1.322 per bag. CompanionLabs removed to this Court on the basis of diversity jurisdiction. The parties have filed cross-motions for summary judgment.

**Summary Judgment Standard**

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The party seeking summary judgment bears the burden of showing that there is no genuine dispute as to any material fact. *Celotex Corp*, 477 U.S. at 323. Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

**Discussion**

Nearly all of the facts presented in the parties' briefs are uncontroverted, making the issues presented ripe for summary judgment. The parties agree Missouri law governs this dispute.

**I.     State Line Bag's motion for summary judgment on Count I is granted in part.**

Under Missouri law, a breach of contract claim consists of four elements: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. 2010).

As the present dispute involves the sale of "goods," it is governed by Article 2 of Missouri's Uniform Commercial Code ("UCC"). *See* Mo. Rev. Stat. § 400.2–105(1) ("goods" means all things which are movable at the time of the identification to the contract for sale). General principles of contract law apply unless "displaced by the particular provisions" of the UCC. *Id.* § 400.1–103. The provisions of the UCC are to be liberally construed. *Computer Network Ltd. v. Purcell Tire & Rubber Co.*, 747 S.W.2d 669, 674 (Mo. Ct. App. 1988).

The essence of the pending motions is whether the undisputed facts establish there was a contract binding CompanionLabs to purchase 100,000 custom bags from State Line Bag. State Line Bag does not discuss all of the elements of its breach of contract claim and focuses most of its argument on whether the parties formed a contract. After arguing a contract was formed and that the statute of frauds does not provide a defense, State Line Bag jumps to the conclusion that the Court should grant summary judgment on its breach of contract claim. The Court cannot make such a leap and only addresses contract formation.

### A. The parties formed a contract for 100,000 Human Unlimited-branded bags.

"The existence of a contract is a jury question only to the extent that the facts surrounding the alleged contract are in dispute; where relevant facts are not in dispute, the existence of a contract is a question of law for the court." *O.R.S. Distilling Co. v. Brown–Forman Corp.,* 972 F.2d 924, 926 (8th Cir. 1992). An enforceable contract requires: (1) parties competent to contract; (2) proper subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation. *Sanders v. Ins. Co. of N. Am.*, 42 S.W.3d 1, 15 (Mo. Ct. App. 2001).

Under the UCC,

> (1) A contract for sale of goods may be made in any manner sufficient to show agreement, *including conduct by both parties* which recognizes the existence of such a contract.
>
> (2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.
>
> (3) Even though one or more terms are left open, a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is reasonably certain basis for giving an appropriate remedy.

*Id.* § 400.2–204 (emphasis added). Unless the language or circumstances unambiguously indicate otherwise, "an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." *Id.* § 400.2-206. As a general common law principle, in order for an acceptance to be effective, it "must be positive and unambiguous." *Kunzie v. Jack-In-The-Box, Inc.*, 330 S.W.3d 476, 484 (Mo. Ct. App. 2010). Further,

> (1) A definite and seasonable *expression of acceptance or a written confirmation* which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

> . . .
>
> (3) *Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract.* In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this chapter.

*Id.* § 400.2-207 (emphasis added).

"The critical question when measuring if a party's words or conduct constitute acceptance is whether the signals sent by the offeree to the offeror objectively manifest the [] intent to be presently bound." *Kunzie*, 330 S.W.3d at 484. The intent to be bound is the parties' objective intent and what a reasonably prudent person would have been led to believe from the actions or words of the parties. *Computer Network*, 747 S.W.2d at 675.

State Line Bag's complaint asserts two alternative contracts but the contract the Court finds most relevant to the facts is that CompanionLabs and State Line Bag agreed State Line Bag would maintain an inventory of custom bags and CompanionLabs would purchase that inventory. CompanionLabs disputes an agreement to purchase 100,000 bags was made and while it was aware that State Line Bag had pre-purchased Human Unlimited-branded bags, it did so unilaterally without consent from CompanionLabs.

In reviewing the undisputed facts, the Court finds the parties entered into a contract through their email exchanges. Three times, once on February 14th and twice on March 8th, Yoder expressed that he would like to hold an inventory of Human Unlimited bags, just as he had done previously with the 40,000 order. Deagan's responses to Yoder's offers were "perfect," "perfect," and "appreciate that." Further, Deagan confirmed the expected arrival time for the 100,000 bags. A reasonably prudent person would understand these affirmative written confirmations as

accepting Yoder's offer because they are positive and unambiguous. They also confirm the subject matter of the agreement, 100,000 custom bags that Yoder would hold in inventory for next day shipping. While Deagan testified that his response of "perfect" to the February 14th email was in relation to the shipping timeframe for an order, that doesn't explain his responses to the March communications. Deagan's emails constitute acceptance of Yoder's offer and an intent to be bound by the agreement.

CompanionLabs argues that the email exchanges could not have established a contract on the basis that the price was not negotiated for the 100,000 quantity. CompanionLabs implies that if it agreed to purchase 100,000 bags it is entitled to a discount. This argument is meritless. The parties routinely negotiated prices and Deagan was certainly familiar with the process. While State Line Bag had offered to sell bags at $1.15 if CompanionLabs committed to a 100,000 quantity in November 2015, CompanionLabs rejected that offer and State Line Bag was under no obligation to offer that price again. Further, CompanionLabs's assertion that State Line Bag is somehow a wrong doer by benefiting through larger profit margins on the bags printed by AQ Textiles, is ridiculous.[5]

CompanionLabs also argues that the parties did not reach a mutual understanding as to the quantity of bags because Yoder came up with the 100,000 quantity all on his own. The Court disagrees. Deagan first proposed a quantity of 100,000 bags in 2015. Then in February 2017, after CompanionLabs ordered the 40,000 bags, Deagan told Yoder to restock his supply. Then Yoder proposed the 100,000 quantity. At that time Deagan had the opportunity to reject Yoder's offer to keep 100,000 bags in inventory or counter with a lesser quantity. Instead, Deagan

---

[5] The Court fully recognizes CompanionLabs acted with a similar profit motive in its dealings with State Line Bag. It is clear there were two different price points at the 5,000 and 10,000 quantity levels. While CompanionLabs ordered 10,000 bags at a time, it is clear it was really placing two 5,000 orders, i.e., receiving a discount for the 10,000 quantity, but really ordering 5,000 bags, thereby contributing to a larger profit margin.

responded "perfect." Then in March, Deagan confirmed that 20,000 bags would be available shortly and 80,000 more were expected in several months. Rather than express concerns with the quantity, Deagan repeatedly responded to Yoder "perfect," "thanks for being proactive," and "appreciate that."

Alternatively, the Court finds the parties entered into a contract through their conduct. Where the writings of the parties do not establish a contract, performance by both parties may be sufficient to establish a contract under Mo. Rev. Stat. § 2–207(3). *White Consol. Indus., Inc. v. McGill Mfg. Co.*, 165 F.3d 1185, 1191–92 (8th Cir. 1999); s*ee PCS Nitrogen Fertilizer, L.P. v. Christy Refractories, L.L.C.,* 225 F.3d 974, 982 (8th Cir. 2000) (holding that the offeree's writing "was not a valid acceptance under UCC § 2–207(1), [but] that the parties nonetheless created a contract under UCC § 2–207(3) through their subsequent conduct[.]"). The parties' actions must support a reasonable inference of mutual understanding and agreement that one party perform and the other party compensate for such performance. *Guidry v. Charter Commc'ns, Inc.*, 269 S.W.3d 520, 529 (Mo. Ct. App. 2008). The parties' course of conduct may lead to the necessary implication that a contractual obligation exists. *Id.*

Here, CompanionLabs and State Line Bag performed in a manner that supports a reasonable inference that State Line Bag would hold 100,000 custom bags in inventory and CompanionLabs would purchase them. The parties were acting under a backdrop that is relevant to review their conduct. Deagan repeatedly communicated to Yoder that his demand for bags would be increasing. He often requested expedited shipping. To accommodate Deagan's needs, Yoder held 40,000 pre-printed bags in inventory for next day shipment. Deagan's response to this arrangement was "awesome," "beautiful," "that's great," and "appreciated." Afterwards, CompanionLabs placed orders for 5,000 bags in October and 10,000 bags in November,

13

December, January, and February. In December when Deagan realized his orders were being shipped next day, he responded to Yoder "well done sir," wink emoticon, and "awesome." Then Deagan told Yoder to restock his supply. Viewing this backdrop and Yoder's similar conduct of stockpiling bags with Deagan's overwhelming approval, supports a finding that the parties intended to enter another agreement to keep an inventory of Human Unlimited bags.

Once Yoder proposed the 100,000-bag inventory and Deagan responded affirmatively, Deagan placed another order for 10,000 bags and confirmed the inventory was arriving in two shipments. In the same month, Deagan placed another order for 10,000 bags. Deagan's continued pattern of ordering with the knowledge that State Line Bag was again holding bags in inventory so that Deagan can have next day shipping further supports a reasonable inference of mutual understanding that State Line Bag would hold an inventory and CompanionLabs would purchase that inventory. *See PCS Nitrogen Fertilizer, L.P.,* 225 F.3d at 982 ("The parties clearly behaved in a manner that recognized the existence of a contract, as demonstrated by Christy's delivery of the goods and PCS's acceptance of, payment for, and attempted use of the goods."); *Guidry v. Charter Commc'ns, Inc.*, 269 S.W.3d 520, 529 (Mo. Ct. App. 2008) ("the parties' actions support a reasonable inference of mutual understanding and agreement"). Further, CompanionLabs did not fail to purchase the remaining inventory because of some problem with the bags or because the relationship between it and State Line Bag was strained. CompanionLabs abandoned its remaining inventory because it decided to discontinue packaging its t-shirts in plastic bags.

Finally, Deagan was aware that Yoder ordered 100,000 bags for inventory and benefited by that arrangement because it eliminated the delay in sending the bags to the printer before they were shipped to CompanionLabs. While Deagan did not ask State Line Bag to keep its custom bags in inventory, Deagan testified he recognized the arrangement benefited CompanionLabs and

14

that he wanted Yoder to hold an inventory of bags because it meant his orders could be shipped on a next day basis. Deagan accepted the benefits of the arrangement and could have told Yoder to stop stockpiling bags, but chose not to, because the situation, as it stood, suited his business purposes.

CompanionLabs argues their conduct could not have formed a contract because the parties did not have a sufficient history doing business in order to establish a "course of dealing." The Court rejects that argument because CompanionLabs provides no authority that parties must conduct business for a certain amount of time in order for their conduct to establish a contract.

### B. The statute of frauds defense does not apply.

As explained above, the Court finds the emails between the parties are a sufficient writing to evidence their agreement. However, the Court addresses the statute of frauds defense because State Line Bag argues it in its motion and CompanionLabs raises it as an affirmative defense.

Because the parties' dispute involves a contract for the sale of goods in excess of five hundred dollars, the contract must satisfy the statute of frauds or one of the exceptions to it. *Id.* § 400.2–201 (statute of frauds applies to contracts for the sale of goods exceeding five hundred dollars). Section 400.2–201 provides:

> (1) Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought . . . A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quality of the goods shown in such writing.
> * * *
> (3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

> (a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement.

The undisputed facts fully support a finding that the specially manufactured goods exception, § 400.2-201(3)(a), applies. The bags are printed with the trademarked Human Unlimited logo making them not suitable for sale to others in the ordinary course of State Line Bag's business. *See Smith-Scharff Paper Co., v. P.N. Hirsch & Co. Stores, Inc.*, 754 S.W.2d 928, 930 (Mo. Ct. App. 1988) (finding bags were specially made when they were stamped with the name of the customer and that they were not suitable for sale to others in the ordinary course of seller's business). Further, State Line Bag completed its procurement of the 100,000 bags before CompanionLabs decided to discontinue its relationship with State Line Bag. Accordingly, even if the parties' emails do not constitute a sufficient writing, the statute of frauds defense does not apply because State Line Bag met all of the requirements under the specially manufactured goods exception.

**II.    The Court denies CompanionLabs's motion for summary judgment on Count II.**

Count II is a promissory estoppel claim. It is unclear from the complaint whether State Line Bag seeks to pursue Count II in addition to Count I or as an alternative. Because of this uncertainty and the Court's finding that the parties had a contract, the Court does not address CompanionLabs's argument that it is entitled to summary judgment on Count II. CompanionLabs's motion for summary judgment on Count II is denied without prejudice.

## Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment (Doc. 26) is GRANTED IN PART, in that the Court finds the parties had a contract. Because Plaintiff does

not discuss the terms of the contract, including price, or any other elements of its claim, the Court cannot rule on the entirely of Plaintiff's Count I. Defendant's motion for summary judgment (Doc. 34) is DENIED.

**IT IS SO ORDERED.**

Date: August 22, 2018                          /s/ Greg Kays
                                               GREG KAYS, CHIEF JUDGE
                                               UNITED STATES DISTRICT COURT